# Richmond

## FEDERAL MOTOR TRUCK COMPANY, A CORPORATION v. J. R. KELLENBERGER AND ROBERT L. HARCUM, INDIVIDUALLY AND TRADING AS FEDERAL TRUCK SALES & SERVICE.

June 16, 1952.

Record No. 3879.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*Herman A. Sacks* and *Bernard Glasser,* for the plaintiff in error.

*Louis Lee Guy,* for the defendants in error.

MILLER, J., delivered the opinion of the court.

On September 8, 1949, Federal Motor Truck Company, hereinafter called plaintiff, instituted this action by notice of motion against J. R. Kellenberger and Robert L. Harcum, trading as Federal Truck Sales and Service Company, hereinafter called defendants. Two jury trials were had. The first resulted in a verdict in favor of plaintiff for $2,407.47 and $250 attorney's fee. That verdict was, on motion of defendants, set aside because of alleged error due to refusal to instruct the jury upon a material issue of fact. On the second trial, at the conclusion of all the evidence, defendants moved the court to strike plaintiff's evidence. That motion was granted, and upon return of verdict in favor of defendants, judgment was entered accordingly.

Plaintiff contends that the court committed no error in the first trial when it refused the instructions asked for by defendants and says that the court should not have set aside the verdict in its favor. We are urged to annul all subsequent proceedings, reinstate that verdict and enter judgment thereon. *Wright* v. *Perry,* 166 Va. 222, 184 S. E. 206. If that be not done, plaintiff asserts that its evidence on the second trial was sufficient to present an issue of fact for the jury and should not have been stricken. It asks that the second verdict and judgment thereon in defendants' favor be reversed and a new trial granted.

The following facts and circumstances appear from the evidence on the first trial:

Defendants were the holders of a dealer's franchise or agreement from plaintiff under which they acquired and sold motor trucks. Federal tractor truck, model 18M2, motor number 1647991, serial number 136021, which had been acquired by defendants from plaintiff and for which payment had been made, was, under a conditional sales contract dated July 24, 1948, sold by defendants to E. J. Miller of Belle Glade, Florida. The purchase price of the truck to Miller (who is referred to in the contract as Customer) was $3,762.80, and of that sum $1,095.74 was paid in cash. The balance of $2,667.06 was "payable at the office of Universal C. I. T. Credit Corporation in 18 successive" equal monthly instalments.

The contract provided, *inter alia,* as follows:

"Title to the car is retained by the holder hereof (meaning Seller, or Universal C. I. T. Credit Corporation * * * if this contract is assigned to it), until said balance is fully paid in money. * * *

"If Customer defaults on any obligation under this contract, or if the holder shall consider the indebtedness or the car insecure, the full balance shall without notice become due forthwith, together with a reasonable sum (15% if allowed by law) as attorney's fees, if this contract is placed with an attorney. Customer agrees in any such case to pay said amount or, at holder's election, to deliver the car to the holder, and holder may, without notice or demand for performance or legal process, enter any premises where the car may be found, take possession of it and custody of anything found in it, and retain all payments as compensation for use of the car while in Customer's possession. The car may be sold with or without notice, at private or public sale (at which the holder may purchase) with or without having the car at the sale; the proceeds less all expenses shall be credited on the amount payable hereunder; Customer shall pay any remaining balance forthwith as liquidated damages for the breach of this contract and shall receive any surplus. * * * *"

On the date of its execution, this contract (along with all interest that defendants had in the truck) was sold, assigned and transferred by defendants to the Universal C. I. T. Credit Corporation, hereinafter called Credit Corporation. Upon assignment of the contract defendants executed the following

guaranty, which is printed on the back of the contract as a part thereof:

"In consideration of the execution of the instrument on the reverse side hereof, we jointly and severally guarantee to any holder the payment promptly when due of every instalment thereunder and the payment on demand of the entire unpaid balance if Customer defaults in payment of any instalment at its due date or in any other manner, without first requiring holder to proceed against Customer. We waive notice of acceptance hereof and defaults thereunder and consent that holder may, without affecting our liability, release any rights against and grant extensions of time of payment to Customer and other obligors."

Miller moved the truck to Florida and when some motor trouble developed, he made complaint to defendants, declined to pay the monthly instalments, and on October 14, 1948, took the truck to a garage or repair shop in Orlando, Florida. The purchaser's complaint was reported to plaintiff, and it undertook to repair the engine, but Miller was dissatisfied and made no further payments. Upon his continued default, Credit Corporation exercised its rights under the contract, and in October, 1948, took possession of and stored the truck in its name in Florida. Plaintiff claims that Miller had abandoned the truck and left it in the repair shop. On December 18, 1948, Credit Corporation wrote defendants and advised them that it had repossessed the truck, stored it to its own order and asked that defendants comply with their guaranty by paying the balance owing under the contract. On April 14, 1949, Credit Corporation wrote defendants again and for the second time informed them that it had repossessed and stored the truck and demanded that defendants make good their guaranty and repurchase within seven days the account on which it said there was then owing $2,667.06. In this letter Credit Corporation stated that if its demand was not met, the truck would be sold to the highest bidder, and action filed against defendants for any deficiency.

In a letter of May 13, 1949, written by H. L. Norton of plaintiff's Sales Department to Thomas A. Dalton, also a representative of plaintiff, but employed in another department, it is stated that the truck had been repurchased by plaintiff from Credit Corporation. That assertion is thus made in the letter:

"According to our Accounting Department, it is understood

that Serial No. 136021 representing a Model 18M2 146'' wheel-base—motor No. 1647991, has been repurchased by us under our Repurchase Agreement with C. I. T.

"Will you please ascertain where this truck is now located, the general condition, etc., and advise at your earliest convenience."

Plaintiff, however, contends that this letter means that the contract had been repurchased and not the truck.

C. A. Rogers, plaintiff's secretary and treasurer, testified that plaintiff had purchased the contract from Credit Corporation for $2,407.47, the sum due thereon, and then as the holder of the contract, instituted this action against defendants upon their guaranty for that sum, plus certain items of expense.

In this connection, he said:

"This contract was originally assigned by the defendants to Universal C. I. T. Credit Corporation at Norfolk, Virginia, and under our repurchase agreement with Universal C. I. T. Credit Corporation we were obliged to pay them the sum of $2,407.47, which is the balance due thereon, plus incidental expenses of $37.00. Our records indicate that we paid this on the first day of April, 1949, and Universal C. I. T. Credit Corporation on June 15, 1949, assigned said contract to us."

This witness also said that the truck was at that date, November 18, 1949, still stored in Florida in Credit Corporation's name.

It thus appears that when Credit Corporation wrote defendants *on April 14, 1949,* demanding payment and threatening to sell the truck, it had already been paid in full by plaintiff on *April 1, 1949,* under what is termed a "repurchase agreement" existing between those two corporations. And when the letter of *May 13, 1949,* was written stating that plaintiff had repurchased the truck, Credit Corporation had then been paid in full. Yet no assignment of the contract was made by Credit Corporation to plaintiff until *June 15, 1949.*

At each trial defendants relied upon section 55-93, Code of 1950 (section 5191a, Code of 1942), the pertinent part of which follows:

"If the vendor of any personal property sold under a written contract whereby the title thereto or a lien thereon is reserved to secure unpaid purchase money, or the assignee or beneficial owner of any such contract, shall repossess and sell such personal property without legal process, such repossession and sale

shall operate to cancel and fully discharge the amount of money secured by such contract, including all unpaid purchase money, notwithstanding any provision to the contrary contained in such contract. * * *''

This section then states and enumerates certain exceptions and conditions under which repossession and sale may be had without cancellation of the debt due under the contract, which, however, are not material to this controversy.

Defendants contended that after they had assigned the contract to Credit Corporation and when Miller refused to make the payments provided for, Credit Corporation had without legal process repossessed the truck and made private sale of it to plaintiff.

Plaintiff asserted that it had not purchased the truck from Credit Corporation but had merely purchased and acquired the conditional sales contract by assignment and was entitled to maintain its action against defendants upon the guaranty. It contended that there was insufficient evidence of sale of the truck to it by Credit Corporation to justify submission of that issue to the jury. It objected to instructions offered by defendants upon that issue, one of which follows:

''The Court instructs the jury that if you believe from the evidence in this case that Universal C. I. T. Credit Corporation repossessed the truck involved without legal process and sold it, other than at public auction after legal notice, then you shall find for the defendants on the notice of motion.''

The Court refused to give this instruction or any other which submitted to the jury the issue of whether or not Credit Corporation had sold the truck to plaintiff. However, after return of the verdict in favor of the plaintiff, the court concluded that this issue should have been put to the jury and set aside the verdict.

The cases of *Universal Credit Co.* v. *Taylor,* 164 Va. 624, 180 S. E. 277, and *Lloyd* v. *Federal Motor Truck Co.,* 168 Va. 72, 190 S. E. 257, both of which involved conditional sales contracts and were actions to recover from the purchaser a deficiency owing upon the debt after repossession and sale of the goods had been made and the net proceeds credited upon the obligation, are cited and relied upon by defendants. However, these cases were decided before enactment of section 55-93, and thus did not deal with the precise question now presented.

The provision of section 55-93, which is invoked by defendants as their defense is clear and unambiguous. If the truck had been repossessed without legal process and privately sold, defendants were not liable. The question presented was factual, and whether or not the instruction should have been given depended solely upon the sufficiency of the evidence to bring the transaction within the terms of the statute.

It is not denied that the truck was repossessed by Credit Corporation without legal process and there was ample evidence upon which the jury could have reasonably concluded that it had been sold by that corporation to plaintiff. Whatever may have been the terms of the repurchase agreement existing between plaintiff and Credit Corporation, which was referred to by the witness Rogers in his testimony, it was not offered in evidence by plaintiff. The letter of April 14, 1949, from Credit Corporation to defendants threatened sale of the truck. Payment of what was due Credit Corporation was made to it by plaintiff on April 1, 1949, two and a half months before assignment of the contract was obtained by plaintiff. In addition to that, the letter of May 13, 1949, from Norton to Dalton, both representatives and employees of plaintiff, stated that the truck had been repurchased by plaintiff.

The evidence as a whole was amply sufficient to sustain a finding that the truck had been sold to plaintiff. The quoted instruction should have been given, and its refusal required that the verdict in plaintiff's favor be set aside and a new trial granted.

On the second trial certain facts and circumstances were shown in evidence in addition to those presented on the first trial. They are as follows:

Defendants proved that when repossessed and repaired in October, 1948, the truck was classified "as a new truck." It remained stored in the name of Credit Corporation, and on May 16, 1949, that company applied for and obtained in its name a Florida automobile repossessed title certificate. Credit Corporation had, however, on April 1, 1949, been paid in full by plaintiff and thus had no interest in the truck when it obtained this title, other than to pass it on to plaintiff or hold it subject to plaintiff's order.

Graydon Woodford, an employee of Credit Corporation, who did not testify at the first trial stated that after his company

repossessed the truck, it secured the repossession title certificate and under a "repurchase agreement" which it held with plaintiff, it was paid the full amount due. After this payment by plaintiff to Credit Corporation, he says that his corporation merely held the title subject to plaintiff's order. To the following questions, he gave the answers indicated:

"Q. When you were on the stand a moment ago, I believe you produced a title certificate showing that the title of this truck is now in the Universal C. I. T., is that right?

"A. That is right.

"Q. The evidence has shown that the Universal C. I. T. has been paid all that was due it by Federal Motor Truck Company, is that correct?

"A. That is correct.

\*　\*　\*　\*　\*

"Q. How do you happen to have the title to the truck?

"A. The title has remained in our hands until such time as it is requested by Federal Motor. They have never requested the title."

\*　\*　\*　\*　\*

"Q. If the Federal Motor Truck Company, the plaintiff, asked for the title to that truck from you now, you would give it to them, is that correct?

"A. Certainly."

This additional evidence conclusively establishes that the truck in question was repossessed by Credit Corporation in the fall of 1948 and a title obtained for it in May, 1949, which might be transferred by Credit Corporation to any purchaser. It further discloses that under some agreement termed a "repurchase agreement" which exists between Credit Corporation and plaintiff, but which plaintiff did not introduce in evidence, not only was the debt owing to Credit Corporation paid by the plaintiff on April 1, 1949, but the truck and the title thereto is and ever since that date has been held subject to the order of plaintiff.

When considered along with the other evidence which was introduced at the second as well as the first trial, these additional facts definitely and conclusively prove that Credit Corporation repossessed the truck without legal process and sold it to plaintiff other than at public auction. Under the express

provisions of section 55-93, that cancelled and discharged the balance of the purchase price debt and relieved the defendants from their obligation under the contract. The judgment is accordingly

*Affirmed.*